*918 Justice Souter
delivered the opinion , of the Court.
The question is under what circumstances the distributor of a product capable of both lawful and unlawful use is liable *919 for acts of copyright infringement by third parties using the product. We hold that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.
I
A
Respondents, Grokster, Ltd., and StreamCast Networks, Inc., defendants in the trial court, distribute free software products that allow computer users to share electronic files through peer-to-peer networks, so called because users’ computers communicate directly with each other, not through *920 central servers. The advantage of peer-to-peer networks over information networks of other types shows up in their substantial and growing popularity. Because they need no central computer server to mediate the exchange of information or files among users, the high-bandwidth communications capacity for a server may be dispensed with, and the need for costly server storage space is eliminated. Since copies of a file (particularly a popular one) are available on many users’ computers, file requests and retrievals may be faster than on other types of networks, and since file exchanges do not travel through a server, communications can take place between any computers that remain connected to the network without risk that a glitch in the server will disable the network in its entirety. Given these benefits in security, cost, and efficiency, peer-to-peer networks are employed to store and distribute electronic files by universities, government agencies, corporations, and libraries, among others.[1]
Other users of peer-to-peer networks include individual recipients of Grokster’s and StreamCast’s software, and although the networks that they enjoy through using the software can be used to share any type of digital file, they have prominently employed those networks in sharing copyrighted music and video files without authorization. A group of copyright holders (MGM for short, but including motion picture studios, recording companies, songwriters, and music publishers) sued Grokster and StreamCast for their users’ copyright infringements, alleging that they *921 knowingly and intentionally distributed their software to enable users to reproduce and distribute the copyrighted works in violation of the Copyright Act, 17 U. S. C. § 101 et seq. (2000 ed. and Supp. II).[2] MGM sought damages and an injunction.
Discovery during the litigation revealed the way the software worked, the business aims of each defendant company, and the predilections of the users. Grokster’s eponymous software employs what is known as FastTrack technology, a protocol developed by others and licensed to Grokster. StreamCast distributes a very similar product except that its software, called Morpheus, relies on what is known as Gnutella technology.[3] A user who downloads and installs either software possesses the protocol to send requests for files directly to the computers of others using software compatible with FastTrack or Gnutella. On the FastTrack network opened by the Grokster software, the user’s request goes to a computer given an indexing capacity by the software and designated a supernode, or to some other computer with comparable power and capacity to collect temporary indexes of the files available on the computers of users connected to it. The supernode (or indexing computer) searches its own index and may communicate the search request to other supernodes. If the file is found, the super-node discloses its location to the computer requesting it, and the requesting user can download the file directly from the computer located. The copied file is placed in a designated sharing folder on the requesting user’s computer, where it is available for other users to download in turn, along with any other file in that folder.
*922 In the Gnutella network made available by Morpheus, the process is mostly the same, except that in some versions of the Gnutella protocol there are no supernodes. In these versions, peer computers using the protocol communicate directly with each other. When a user enters a search request into the Morpheus software, it sends the request to computers connected with it, which in turn pass the request along to other connected peers. The search results are communicated to the requesting computer, and the user can download desired files directly from peers’ computers. As this description indicates, Grokster and StreamCast use no servers to intercept the content of the search requests or to mediate the file transfers conducted by users of the software, there being no central point through which the substance of the communications passes in either direction.[4]
Although Grokster and StreamCast do not therefore know when particular files are copied, a few searches using their software would show what is available on the networks the software reaches. MGM commissioned a statistician to conduct a systematic search, and his study showed that nearly 90% of the files available for download on the FastTrack system were copyrighted works.[5] Grokster and StreamCast dispute this figure, raising methodological problems and arguing that free copying even of copyrighted works may be authorized by the rightholders. They also argue that potential noninfringing uses of their software are significant in kind, even if infrequent in practice. Some musical performers, for example, have gained new audiences by distributing *923 their copyrighted works for free across peer-to-peer networks, and some distributors of unprotected content have used peer-to-peer networks to disseminate files, Shakespeare being an example. Indeed, StreamCast has given Morpheus users the opportunity to download the briefs in this very case, though their popularity has not been quantified.
As for quantification, the parties’ anecdotal and statistical evidence entered thus far to show the content available on the FastTrack and Gnutella networks does not say much about which files are actually downloaded by users, and no one can say how often the software is used to obtain copies of unprotected material. But MGM’s evidence gives reason to think that the vast majority of users’ downloads are acts of infringement, and because well over 100 million copies of the software in question are known to have been downloaded, and billions of files are shared across the FastTrack and Gnutella networks each month, the probable scope of copyright infringement is staggering.
Grokster and StreamCast concede the infringement in most downloads, Brief for Respondents 10, n. 6, and it is uncontested that they are aware that users employ their software primarily to download copyrighted files, even if the decentralized FastTrack and Gnutella networks fail to reveal which files are being copied, and when. From time to time, moreover, the companies have learned about their users’ infringement directly, as from users who have sent e-mail to each company with questions about playing copyrighted movies they had downloaded, to whom the companies have responded with guidance.[6] App. 559-563,808-816, 939-954. And MGM notified the companies of 8 million copyrighted files that could be obtained using their software.
Grokster and StreamCast are not, however, merely passive recipients of information about infringing use. The record is replete with evidence that from the moment Grokster *924 and StreamCast began to distribute their free software, each one clearly voiced the objective that recipients use it to download copyrighted works, and each took active steps to encourage infringement.
After the notorious file-sharing service, Napster, was sued by copyright holders for facilitation of copyright infringement, A&M Records, Inc. v. Napster, Inc., 114 F. Supp. 2d 896 (ND Cal. 2000), aff’d in part, rev’d in part, 239 F. 3d 1004 (CA9 2001), StreamCast gave away a software program of a kind known as OpenNap, designed as compatible with the Napster program and open to Napster users for downloading files from other Napster and OpenNap users’ computers. Evidence indicates that “[i]t was always [StreamCast’s] intent to use [its OpenNap network] to be able to capture email addresses of [its] initial target market so that [it] could promote [its] StreamCast Morpheus interface to them,” App. 861; indeed, the OpenNap program was engineered “ ‘to leverage Napster’s 50 million user base,’ ” id., at 746.
StreamCast monitored both the number of users downloading its OpenNap program and the number of music files they downloaded. Id., at 859,863,866. It also used the resulting OpenNap network to distribute copies of the Morpheus software and to encourage users to adopt it. Id., at 861, 867, 1039. Internal company documents indicate that StreamCast hoped to attract large numbers of former Napster users if that company was shut down by court order or otherwise, and that StreamCast planned to be the next Napster. Id., at 861. A kit developed by StreamCast to be delivered to advertisers, for example, contained press articles about StreamCast’s potential to capture former Napster users, id., at 568-572, and it introduced itself to some potential advertisers as a company “which is similar to what Napster was,” id., at 884. It broadcast banner advertisements to users of other Napster-compatible software, urging them to adopt its OpenNap. Id., at 586. An internal e-mail from a company executive stated: “ ‘We have put this network in *925 place so that when Napster pulls the plug on their free service ... or if the Court orders them shut down prior to that... we will be positioned to capture the flood of their 32 million users that will be actively looking for an alternative.’” Id., at 588-589, 861.
Thus, StreamCast developed promotional materials to market its service as the best Napster alternative. One proposed advertisement read: “Napster Inc. has announced that it will soon begin charging you a fee. That’s if the courts don’t order it shut down first. What will you do to get around it?” Id., at 897. Another proposed ad touted StreamCast’s software as the “#1 alternative to Napster” and asked “[w]hen the lights went off at Napster . . . where did the users go?” Id., at 836 (ellipsis in original).[7] StreamCast even planned to flaunt the illegal uses of its software; when it launched the OpenNap network, the chief technology officer of the company averred that “[t]he goal is to get in trouble with the law and get sued. It’s the best way to get in the new[s].” Id., at 916.
The evidence that Grokster sought to capture the market of former Napster users is sparser but revealing, for Grok-ster launched its own OpenNap system called Swaptor and inserted digital codes into its Web site so that computer users using Web search engines to look for “Napster” or “[f]ree file sharing” would be directed to the Grokster Web site, where they could download the Grokster software. Id., at 992-993. And Grokster’s name is an apparent derivative of Napster.
StreamCast’s executives monitored the number of songs by certain commercial artists available on their networks, and an internal communication indicates they aimed to have a larger number of copyrighted songs available on their net *926 works than other file-sharing networks. Id., at 868. The point, of course, would be to attract users of a mind to infringe, just as it would be with their promotional materials developed showing copyrighted songs as examples of the kinds of files available through Morpheus. Id., at 848. Morpheus in fact allowed users to search specifically for “Top 40” songs, id., at 735, which were inevitably copyrighted. Similarly, Grokster sent users a newsletter promoting its ability to provide particular, popular copyrighted materials. Brief for Motion Picture Studio and Recording Company Petitioners 7-8.
In addition to this evidence of express promotion, marketing, and intent to promote further, the business models employed by Grokster and StreamCast confirm that their principal object was use of their software to download copyrighted works. Grokster and StreamCast receive no revenue from users, who obtain the software itself for nothing. Instead, both companies generate income by selling advertising space, and they stream the advertising to Grokster and Morpheus users while they are employing the programs. As the number of users of each program increases, advertising opportunities become worth more. Cf. App. 539, 804. While there is doubtless some demand for free Shakespeare, the evidence shows that substantive volume is a function of free access to copyrighted work. Users seeking Top 40 songs, for example, or the latest release by Modest Mouse, are certain to be far more numerous than those seeking a free Decameron, and Grokster and StreamCast translated that demand into dollars.
Finally, there is no evidence that either company made an effort to filter copyrighted material from users’ downloads or otherwise impede the sharing of copyrighted files. Although Grokster appears to have sent e-mails warning users about infringing content when it received threatening notice from the copyright holders, it never blocked anyone from continuing to use its software to share copyrighted files. *927 Id., at 75-76. StreamCast not only rejected another company’s offer of help to monitor infringement, id., at 928-929, but blocked the Internet Protocol addresses of entities it believed were trying to engage in such monitoring on its networks, id., at 917-922.
B
After discovery, the parties on each side of the case cross-moved for summary judgment. The District Court limited its consideration to the asserted liability of Grokster and StreamCast for distributing the current versions of their software, leaving aside whether either was liable “for damages arising from past versions of their software, or from other past activities.” 259 F. Supp. 2d 1029, 1038 (CD Cal. 2003). The District Court held that those who used the Grokster and Morpheus software to download copyrighted media files directly infringed MGM’s copyrights, a conclusion not contested on appeal, but the court nonetheless granted summary judgment in favor of Grokster and StreamCast as to any liability arising from distribution of the then-current versions of their software. Distributing that software gave rise to no liability in the court’s view, because its use did not provide the distributors with actual knowledge of specific acts of infringement. Case No. CV 01 08541 SVW (PJWx) (CD Cal., June 18, 2003), App. 1213.
The Court of Appeals affirmed. 380 F. 3d 1154 (CA9 2004). In the court’s analysis, a defendant was liable as a contributory infringer when it had knowledge of direct infringement and materially contributed to the infringement. But the court read Sony Corp. of America v. Universal City Studios, Inc., 464 U. S. 417 (1984), as holding that distribution of a commercial product capable of substantial nonin-fringing uses could not give rise to contributory liability for infringement unless the distributor had actual knowledge of specific instances of infringement and failed to act on that knowledge. The fact that the software was capable of substantial noninfringing uses in the Ninth Circuit’s view meant *928 that Grokster and StreamCast were not liable, because they had no such actual knowledge, owing to the decentralized architecture of their software. The court also held that Grokster and StreamCast did not materially contribute to their users’ infringement because it was the users themselves who searched for, retrieved, and stored the infringing files, with no involvement by the defendants beyond providing the software in the first place.
The Ninth Circuit also considered whether Grokster and StreamCast could be liable under a theory of vicarious infringement. The court held against liability because the defendants did not monitor or control the use of the software, had no agreed-upon right or current ability to supervise its use, and had no independent duty to police infringement. We granted certiorari. 543 U. S. 1032 (2004).
I — ( h-i
A
MGM and many of the amici fault the Court of Appeals’s holding for upsetting a sound balance between the respective values of supporting creative pursuits through copyright protection and promoting innovation in new communication technologies by limiting the incidence of liability for copyright infringement. The more artistic protection is favored, the more technological innovation may be discouraged; the administration of copyright law is an exercise in managing the tradeoff. See Sony Corp. v. Universal City Studios, supra, at 442; see generally Ginsburg, Copyright and Control Over New Technologies of Dissemination, 101 Colum. L. Rev. 1613 (2001); Lichtman & Landes, Indirect Liability for Copyright Infringement: An Economic Perspective, 16 Harv. J. L. & Tech. 395 (2003).
The tension between the two values is the subject of this case, with its claim that digital distribution of copyrighted material threatens copyright holders as never before, because every copy is identical to the original, copying is easy, *929 and many people (especially the young) use file-sharing software to download copyrighted works. This very breadth of the software’s use may well draw the public directly into the debate over copyright policy, Peters, Brace Memorial Lecture: Copyright Enters the Public Domain, 51 J. Copyright Soe. 701, 705-717 (2004) (address by Register of Copyrights), and the indications are that the ease of copying songs or movies using software like Grokster’s and Napster’s is fostering disdain for copyright protection, Wu, When Code Isn’t Law, 89 Va. L. Rev. 679, 724-726 (2003). As the case has been presented to us, these fears are said to be offset by the different concern that imposing liability, not only on in-fringers but on distributors of software based on its potential for unlawful use, could limit further development of beneficial technologies. See, e. g., Lemley & Reese, Reducing Digital Copyright Infringement Without Restricting Innovation, 56 Stan. L. Rev. 1345,1386-1390 (2004); Brief for Innovation Scholars and Economists as Amici Curiae 15-20; Brief for Emerging Technology Companies as Amici Curiae 19-25; Brief for Intel Corporation as Amicus Curiae 20-22.[8]
The argument for imposing indirect liability in this case is, however, a powerful one, given the number of infringing downloads that occur every day using StreamCast’s and Grokster’s software. When a widely shared service or product is used to commit infringement, it may be impossible to *930 enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious infringement. See In re Aimster Copyright Litigation, 334 F. 3d 643, 645-646 (CA7 2003).
One infringes contributorily by intentionally inducing or encouraging direct infringement, see Gershwin Pub. Corp. v. Columbia Artists Management, Inc., 443 F. 2d 1159, 1162 (CA2 1971), and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it, Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F. 2d 304, 307 (CA2 1963).[9] Although “[t]he Copyright Act does not expressly render anyone liable for infringement committed by another,” Sony Corp. v. Universal City Studios, 464 U. S., at 434, these doctrines of secondary liability emerged from common law principles and are well established in the law, id., at 486 (Blackmun, J., dissenting); Kalem Co. v. Harper Brothers, 222 U. S. 55, 62-63 (1911); Gershwin Pub. Corp. v. Columbia Artists Management, *931 supra, at 1162; 3 M. Nimmer & D. Nimmer, Copyright § 12.04[A] (2005).
B
Despite the currency of these principles of secondary liability, this Court has dealt with secondary copyright infringement in only one recent case, and because MGM has tailored its principal claim to our opinion there, a look at our earlier holding is in order. In Sony Corp. v. Universal City Studios, supra, this Court addressed a claim that secondary liability for infringement can arise from the very distribution of a commercial product. There, the product, novel at the time, was what we know today as the videocassette recorder or VCR. Copyright holders sued Sony as the manufacturer, claiming it was contributorily liable for infringement that occurred when VCR owners taped copyrighted programs because it supplied the means used to infringe, and it had constructive knowledge that infringement would occur. At the trial on the merits, the evidence showed that the principal use of the VCR was for “‘time-shifting,’” or taping a program for later viewing at a more convenient time, which the Court found to be a fair, not an infringing, use. Id., at 423-424. There was no evidence that Sony had expressed an object of bringing about taping in violation of copyright or had taken active steps to increase its profits from unlawful taping. Id., at 438. Although Sony’s advertisements urged consumers to buy the VCR to “ ‘record favorite shows’ ” or “‘build a library’” of recorded programs, id., at 459 (Black-mun, J., dissenting), neither of these uses was necessarily infringing, id., at 424, 454-455.
On those facts, with no evidence of stated or indicated intent to promote infringing uses, the only conceivable basis for imposing liability was on a theory of contributory infringement arising from its sale of VCRs to consumers with knowledge that some would use them to infringe. Id., at 439. But because the VCR was “capable of commercially significant noninfringing uses,” we held the manufacturer *932 could not be faulted solely on the basis of its distribution. Id., at 442.
This analysis reflected patent law’s traditional staple article of commerce doctrine, now codified, that distribution of a component of a patented device will not violate the patent if it is suitable for use in other ways. 35 U. S. C. § 271(c); Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U. S. 476, 485 (1964) (noting codification of cases); id., at 486, n. 6 (same). The doctrine was devised to identify instances in which it may be presumed from distribution of an article in commerce that the distributor intended the article to be used to infringe another’s patent, and so may justly be held liable for that infringement. “One who makes and sells articles which are only adapted to be used in a patented combination will be presumed to intend the natural consequences of his acts; he will be presumed to intend that they shall be used in the combination of the patent.” New York Scaffolding Co. v. Whitney, 224 F. 452, 459 (CA8 1915); see also James Heekin Co. v. Baker, 138 F. 63, 66 (CA8 1905); Canda v. Michigan Malleable Iron Co., 124 F. 486, 489 (CA6 1903); Thomson-Houston Electric Co. v. Ohio Brass Co., 80 F. 712, 720-721 (CA6 1897); Red Jacket Mfg. Co. v. Davis, 82 F. 432, 439 (CA7 1897); Holly v. Vergennes Machine Co., 4 F. 74, 82 (CC Vt. 1880); Renwick v. Pond, 20 F. Cas. 536, 541 (No. 11,702) (CC SDNY 1872).
In sum, where an article is “good for nothing else” but infringement, Canda v. Michigan Malleable Iron Co., supra, at 489, there is no legitimate public interest in its unlicensed availability, and there is no injustice in presuming or imputing an intent to infringe, see Henry v. A. B. Dick Co., 224 U. S. 1, 48 (1912), overruled on other grounds, Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U. S. 502 (1917). Conversely, the doctrine absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits liability to instances of more acute *933 fault than the mere understanding that some of one’s products will be misused. It leaves breathing room for innovation and a vigorous commerce. See Sony Corp. v. Universal City Studios, 464 U. S., at 442; Dawson Chemical Co. v. Rohm & Haas Co., 448 U. S. 176, 221 (1980); Henry v. A. B. Dick Co., supra, at 48.
The parties and many of the amici in this case think the key to resolving it is the Sony rule and, in particular, what it means for a product to be “capable of commercially significant noninfringing uses.” Sony Corp. v. Universal City Studios, supra, at 442. MGM advances the argument that granting summary judgment to Grokster and StreamCast as to their current activities gave too much weight to the value of innovative technology, and too little to the copyrights infringed by users of their software, given that 90% of works available on one of the networks was shown to be copyrighted. Assuming the remaining 10% to be its noninfring-ing use, MGM says this should not qualify as “substantial,” and the Court should quantify Sony to the extent of holding that a product used “principally” for infringement does not qualify. See Brief for Motion Picture Studio and Recording Company Petitioners 31. As mentioned before, Grokster and StreamCast reply by citing evidence that their software can be used to reproduce public domain works, and they point to copyright holders who actually encourage copying. Even if infringement is the principal practice with their software today, they argue, the noninfringing uses are significant and will grow.
We agree with MGM that the Court of Appeals misapplied Sony, which it read as limiting secondary liability quite beyond the circumstances to which the case applied. Sony barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement. The *934 Ninth Circuit has read Sony’s limitation to mean that whenever a product is capable of substantial lawful use, the producer can never be held contributorily liable for third parties’ infringing use of it; it read the rule as being this broad, even when an actual purpose to cause infringing use is shown by evidence independent of design and distribution of the product, unless the distributors had “specific knowledge of infringement at a time at which they contributed to the infringement, and failed to act upon that information.” 380 F. 3d, at 1162 (internal quotation marks and brackets omitted). Because the Circuit found the StreamCast and Grok-ster software capable of substantial lawful use, it concluded on the basis of its reading of Sony that neither company could be held liable, since there was no showing that their software, being without any central server, afforded them knowledge of specific unlawful uses.
This view of Sony, however, was error, converting the ease from one about liability resting on imputed intent to one about liability on any theory. Because Sony did not displace other theories of secondary liability, and because we find below that it was error to grant summary judgment to the companies on MGM’s inducement claim, we do not revisit Sony further, as MGM requests, to add a more quantified description of the point of balance between protection and commerce when liability rests solely on distribution with knowledge that unlawful use will occur. It is enough to note that the Ninth Circuit’s judgment rested on an erroneous understanding of Sony and to leave further consideration of the Sony rule for a day when that may be required.
C
Sony’s rule limits imputing culpable intent as a matter of law from the characteristics or uses of a distributed product. But nothing in Sony requires courts to ignore evidence of intent if there is such evidence, and the case was never meant to foreclose rules of fault-based liability derived from *935 the common law.[10] Sony Corp. v. Universal City Studios, supra, at 439 (“If vicarious liability is to be imposed on Sony in this ease, it must rest on the fact that it has sold equipment with constructive knowledge” of the potential for infringement). Thus, where evidence goes beyond a product’s characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement, Sony’s staple-article rule will not preclude liability.
The classic case of direct evidence of unlawful purpose occurs when one induces commission of infringement by another, or “entic[es] or persuad[es] another” to infringe, Black’s Law Dictionary 790 (8th ed. 2004), as by advertising. Thus at common law a copyright or patent defendant who “not only expected but invoked [infringing use] by advertisement” was liable for infringement “on principles recognized in every part of the law.” Kalem Co. v. Harper Brothers, 222 U. S., at 62-63 (copyright infringement). See also Henry v. A. B. Dick Co., 224 U. S., at 48-49 (contributory liability for patent infringement may be found where a good’s “most conspicuous use is one which will cooperate in an infringement when sale to such user is invoked by advertisement” of the infringing use); Thomson-Houston Electric Co. v. Kelsey Electric R. Specialty Co., 75 F. 1005, 1007-1008 (CA2 1896) (relying on advertisements and displays to find defendant’s “willingness ... to aid other persons in any attempts which they may be disposed to make towards [patent] infringement”); Rumford Chemical Works v. Hecker, 20 F. Cas. 1342, 1346 (No. 12,133) (CC NJ 1876) (demonstrations of infringing activity along with “avowals of the [infringing] purpose and use for which it was made” supported liability for patent infringement).
*936 The rule on inducement of infringement as developed in the early cases is no different today.[11] Evidence of “active steps . . . taken to encourage direct infringement,” Oak Industries, Inc. v. Zenith Electronics Corp., 697 F. Supp. 988, 992 (ND Ill. 1988), such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law’s reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use, see, e. g., Water Technologies Corp. v. Calco, Ltd., 850 F. 2d 660, 668 (CA Fed. 1988) (liability for inducement where one “actively and knowingly aid[s] and abet[s] another’s direct infringement” (emphasis deleted)); Fromberg, Inc. v. Thornhill, 315 F. 2d 407, 412-413 (CA5 1963) (demonstrations by sales staff of infringing uses supported liability for inducement); Haworth Inc. v. Herman Miller Inc., 37 USPQ 2d 1080, 1090 (WD Mich. 1994) (evidence that defendant “demonstrate[d] and recommend[ed] infringing configurations” of its product could support inducement liability); Sims v. Mack Trucks, Inc., 459 F. Supp. 1198, 1215 (ED Pa. 1978) (finding inducement where the use “depicted by the defendant in its promotional film and brochures infringes the . . . patent”), overruled on other grounds, 608 F. 2d 87 (CA3 1979). Cf. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 37 (5th ed. 1984) (“There is a definite tendency to impose greater responsibility upon a defendant whose conduct was intended to do harm, or was morally wrong”).
For the same reasons that Sony took the staple-article doctrine of patent law as a model for its copyright safe-harbor rule, the inducement rule, too, is a sensible one for copyright. We adopt it here, holding that one who distributes a device with the object of promoting its use to infringe copyright, as *937 shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties. We are, of course, mindful of the need to keep from trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential. Accordingly, just as Sony did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to infringe, 464 U. S., at 489, n. 19, mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability. Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in themselves. The inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful promise.
t — l f
A
The only apparent question about treating MGM’s evidence as sufficient to withstand summary judgment under the theory of inducement goes to the need on MGM’s part to adduce evidence that StreamCast and Grokster communicated an inducing message to their software users. The classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations. MGM claims that such a message is shown here. It is undisputed that StreamCast beamed onto the computer screens of users of Napster-compatible programs ads urging the adoption of its OpenNap program, which was designed, as its name implied, to invite the custom of patrons of Napster, then under attack in the courts for facilitating massive infringement. Those who accepted StreamCast’s OpenNap program were offered software to perform the same services, which a factfinder could conclude *938 would readily have been understood in the Napster market as the ability to download copyrighted music files. Grokster distributed an electronic newsletter containing links to articles promoting its software’s ability to access popular copyrighted music. And anyone whose Napster or free file-sharing searches turned up a link to Grokster would have understood Grokster to be offering the same file-sharing ability as Napster, and to the same people who probably used Napster for infringing downloads; that would also have been the understanding of anyone offered Grokster’s suggestively named Swaptor software, its version of OpenNap. And both companies communicated a clear message by responding affirmatively to requests for help in locating and playing copyrighted materials.
In StreamCast’s case, of course, the evidence just described was supplemented by other unequivocal indications of unlawful purpose in the internal communications and advertising designs aimed at Napster users (“When the lights went off at Napster ... where did the users go?” App. 836 (ellipsis in original)). Whether the messages were communicated is not to the point on this record. The function of the message in the theory of inducement is to prove by a defendant’s own statements that his unlawful purpose disqualifies him from claiming protection (and incidentally to point to actual violators likely to be found among those who hear or read the message). See supra, at 935-937. Proving that a message was sent out, then, is the preeminent but not exclusive way of showing that active steps were taken with the purpose of bringing about infringing acts, and of showing that infringing acts took place by using the device distributed. Here, the summary judgment record is replete with other evidence that Grokster and StreamCast, unlike the manufacturer and distributor in Sony, acted with a purpose to cause copyright violations by use of software suitable for illegal use. See supra, at 924-927.
*939 Three features of this evidence of intent are particularly notable. First, each company showed itself to be aiming to satisfy a known source of demand for copyright infringement, the market comprising former Napster users. StreamCast’s internal documents made constant reference to Napster, it initially distributed its Morpheus software through an OpenNap program compatible with Napster, it advertised its OpenNap program to Napster users, and its Morpheus software functions as Napster did except that it could be used to distribute more kinds of files, including copyrighted movies and software programs. Grokster’s name is apparently derived from Napster, it too initially offered an OpenNap program, its software’s function is likewise comparable to Napster’s, and it attempted to divert queries for Napster onto its own Web site. Grokster and StreamCast’s efforts to supply services to former Napster users, deprived of a mechanism to copy and distribute what were overwhelmingly infringing files, indicate a principal, if not exclusive, intent on the part of each to bring about infringement.
Second, this evidence of unlawful objective is given added significance by MGM’s showing that neither company attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software. While the Ninth Circuit treated the defendants’ failure to develop such tools as irrelevant because they lacked an independent duty to monitor their users’ activity, we think this evidence underscores Grokster’s and StreamCast’s intentional facilitation of their users’ infringement.[12]
Third, there is a further complement to the direct evidence of unlawful objective. It is useful to recall that StreamCast *940 and Grokster make money by selling advertising space, by directing ads to the screens of computers employing their software. As the record shows, the more the software is used, the more ads are sent out and the greater the advertising revenue becomes. Since the extent of the software’s use determines the gain to the distributors, the commercial sense of their enterprise turns on high-volume use, which the record shows is infringing.[13] This evidence alone would not justify an inference of unlawful intent, but viewed in the context of the entire record its import is clear.
The unlawful objective is unmistakable.
B
In addition to intent to bring about infringement and distribution of a device suitable for infringing use, the inducement theory of course requires evidence of actual infringement by recipients of the device, the software in this case. As the account of the facts indicates, there is evidence of infringement on a gigantic scale, and there is no serious issue of the adequacy of MGM’s showing on this point in order to survive the companies’ summary judgment requests. Al *941 though an exact calculation of infringing use, as a basis for a claim of damages, is subject to dispute, there is no question that the summary judgment evidence is at least adequate to entitle MGM to go forward with claims for damages and equitable relief.
* * *
In sum, this case is significantly different from Sony and reliance on that case to rule in favor of StreamCast and Grokster was error. Sony dealt with a claim of liability based solely on distributing a product with alternative lawful and unlawful uses, with knowledge that some users would follow the unlawful course. The case struck a balance between the interests of protection and innovation by holding that the product’s capability of substantial lawful employment should bar the imputation of fault and consequent secondary liability for the unlawful acts of others.
MGM’s evidence in this case most obviously addresses a different basis of liability for distributing a product open to alternative uses. Here, evidence of the distributors’ words and deeds going beyond distribution as such shows a purpose to cause and profit from third-party acts of copyright infringement. If liability for inducing infringement is ultimately found, it will not be on the basis of presuming or imputing fault, but from inferring a patently illegal objective from statements and actions showing what that objective was.
There is substantial evidence in MGM’s favor on all eler ments of inducement, and summary judgment in favor of Grokster and StreamCast was error. On remand, reconsideration of MGM’s motion for summary judgment will be in order.
The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 Peer-to-peer networks have disadvantages as well. Searches on peer-to-peer networks may not reach and uncover all available files because search requests may not be transmitted to every computer on the network. There may be redundant copies of popular files. The creator of the software has no incentive to minimize storage or bandwidth consumption, the costs of which are borne by every user of the network. Most relevant here, it is more difficult to control the content of files available for retrieval and the behavior of users.

 The studios and recording companies and the songwriters and music publishers filed separate suits against the defendants that were consolidated by the District Court.

 Subsequent versions of Morpheus, released after the record was made in this case, apparently rely not on Gnutella but on a technology called Neonet. These developments are not before us.

 There is some evidence that both Grokster and StreamCast previously operated supernodes, which compiled indexes of files available on all of the nodes connected to them. This evidence, pertaining to previous versions of the defendants’ software, is not before us and would not affect our conclusions in any event.

 By comparison, evidence introduced by the plaintiffs in A&M Records, Inc. v. Napster, Inc., 239 F. 3d 1004 (CA9 2001), showed that 87% of files available on the Napster file-sharing network were copyrighted, id., at 1013.

 The Grokster founder contends that in answering these e-mails he often did not read them fully. App. 77, 769.

 The record makes clear that StreamCast developed these promotional materials but not whether it released them to the public. Even if these advertisements were not released to the public and do not show encouragement to infringe, they illuminate StreamCast’s purposes.

 The mutual exclusivity of these values should not be overstated, however. On the one hand technological innovators, including those writing file-sharing computer programs, may wish for effective copyright protections for their work. See, e. g., Wu, When Code Isn’t Law, 89 Va. L. Rev. 679, 750 (2003). (StreamCast itself was urged by an associate to “get [its] technology written down and [its intellectual property] protected.” App. 866.) On the other hand the widespread distribution of creative works through improved technologies may enable the synthesis of new works or generate audiences for emerging artists. See Eldred v. Ashcroft, 537 U. S. 186, 223-226 (2003) (Stevens, J., dissenting); Van Houweling, Distributive Values in Copyright, 83 Texas L. Rev. 1535, 1539-1540, 1562-1564 (2005); Brief for Sovereign Artists et al. as Amici Curiae II.

 We stated in Sony Corp. of America v. Universal City Studios, Inc., 464 U. S. 417 (1984), that ‘“the lines between direct infringement, contributory infringement and vicarious liability are not clearly drawn' . . . . [Reasoned analysis of [the Sony plaintiffs’ contributory infringement claim] necessarily entails consideration of arguments and case law which may also be forwarded under the other labels, and indeed the parties ... rely upon such arguments and authority in support of their respective positions on the issue of contributory infringement,” id., at 435, n. 17 (quoting Universal City Studios, Inc. v. Sony Corp. of America, 480 F. Supp. 429, 457-458 (CD Cal. 1979)). In the present case MGM has argued a vicarious liability theory, which allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement. See, e. g., Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F. 2d 304, 308 (CA2 1963); Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co., 36 F. 2d 354, 355 (CA7 1929). Because we resolve the case based on an inducement theory, there is no need to analyze separately MGM’s vicarious liability theory.

 Nor does the Patent Act’s exemption from liability for those who distribute a staple article of commerce, 35 U. S. C. § 271(c), extend to those who induce patent infringement, § 271(b).

 Inducement has been codified in patent law. Ibid.

 Of course, in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses. Such a holding would tread too close to the Sony safe harbor.

 Grokster and StreamCast contend that any theory of liability based on their conduct is not properly before this Court because the rulings in the trial and appellate courts dealt only with the present versions of their software, not “past acts . . . that allegedly encouraged infringement or assisted .. . known acts of infringement.” Brief for Respondents 14; see also id., at 34. This contention misapprehends the basis for their potential liability. It is not only that encouraging a particular consumer to infringe a copyright can give rise to secondary liability for the infringement that results. Inducement liability goes beyond that, and the distribution of a product can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe. In such a case, the culpable act is not merely the encouragement of infringement but also the distribution of the tool intended for infringing use. See Kalem Co. v. Harper Brothers, 222 U. S. 55, 62-63 (1911); Cable/Home Communication Corp. v. Network Productions, Inc., 902 F. 2d 829, 846 (CA11 1990); A&M Records, Inc. v. Abdallah, 948 F. Supp. 1449, 1456 (CD Cal. 1996).