**JAGEX LIMITED, Plaintiff,**

v.

**IMPULSE SOFTWARE, Eric Snellman and Marc Snellman, Defendants.**

**Civil Action No. 10–10216–NMG.**

United States District Court,
D. Massachusetts.

Aug. 16, 2010.

Christopher Roth, Ross Alan Dannenberg, Banner & Witcoff, Ltd., Washington, DC, Peter D. McDermott, Erin E. Bryan, Banner & Witcoff, Ltd., Boston, MA, for Plaintiff.

Amber N. Davis, Terry M. Sanks, Beusse Wolter Sanks Mora & Maire, P.A., Orlando, FL, Ieuan–Gael Mahony, Holland & Knight, LLP, Boston, MA, for Defendants.

## MEMORANDUM & ORDER

GORTON, District Judge.

In the instant case, plaintiff Jagex Limited ("Jagex"), the owner of an interactive computer game, has brought various claims against defendants Impulse Software, Eric Snellman and Mark Snellman for copyright and trademark infringement. Before the Court are defendants' motion to dismiss for lack of jurisdiction and plaintiff's motion for preliminary injunction.

## I. *Factual Background*

Plaintiff Jagex, a foreign corporation organizing under the laws of the United Kingdom, owns and operates "Runescape," a massive multi-player online game ("MMOG"). In 2008, the Guinness Book of World Records recognized Runescape as the world's most popular free online role-playing game, with over 130 million accounts created since the launch of the game in 2001.

Runescape operates in a fantasy world in which a player guides a customizable avatar (a virtual character) through a visually stimulating environment, completing goals and objectives as set by the player. Players interact with one another by trading, chatting or participating (cooperatively or combatively) in mini-games and challenges.

A player may choose either to play Runescape for free, whereby he gains basic access to the game or to pay for a subscription which provides access to additional levels and skills. Succeeding at either version of Runescape entails a substantial commitment of time and effort. For example, as of October, 2009, the three highest-ranked players had each spent an average of approximately 20,000 hours involved in a game, e.g., 50 hours per week for almost eight years. As players progress, they are rewarded with "experience points" and virtual "gold coins" which symbolize status in the Runescape community and allow the players to acquire resources and complete quests more effectively.

The defendants, Eric and Mark Snellman, both of whom reside in Florida and do business as Impulse Software, (collectively, "the Snellman brothers") operate several websites which offer tools that allow players to cheat at MMOGs such as Runescape. More specifically, the Snellman brothers develop and sell a software program called "iBot" or "Bot" (gamer jargon for "robot") that enables Runescape users to advance their characters through the game with little or no human participation.

The Bot software functions by downloading a copy of Runescape from the free, online website and using a process called "reflection" to examine the game's internal operation which is normally hidden from users. The Bot software uses this information to identify objects within the Runescape game with which it wishes to interact and then completes a desired task according to instructions from a script. In essence, the Bot plays the game for its owner while she is away from her computer. The defendants' technology allows a Bot user to progress more rapidly than a player who completes each task manually, thereby giving the Bot user an unfair advantage over the "honest" player and allegedly resulting in a diminished experience for the gaming community as a whole.

Jagex alleges that although Runescape's Terms and Conditions expressly prohibit the use of such Bots, more and more players have begun to use them. As a result, honest players have purportedly become frustrated and stopped playing the game and new players are increasingly reluctant to sign up. Jagex also claims that since being served with the complaint in this lawsuit, the Snellman brothers have launched a new website from which they sell the allegedly infringing Bots.

## II. *Procedural History*

On February 9, 2010, Jagex filed a four-count complaint against the Snellman brothers alleging 1) copyright infringement, 2) violation of the Digital Millennium Copyright Act, 3) trademark infringement under the Lanham Act and 4) violation of the Computer Fraud and Abuse Act. The defendants responded by moving to dis-

miss for lack of personal jurisdiction and improper venue. In the alternative, they seek transfer to the United States District Court for the Middle District of Florida, where they both reside. Jagex also seeks a preliminary injunction prohibiting the defendants from selling and promoting their allegedly infringing software.

The Court convened a motion hearing on July 27, 2010, at which time it announced its tentative rulings and posed various questions to the parties. Having fully considered the parties' written submissions and oral arguments, the Court now publishes its decision.

### III. *Legal Analysis*

#### A. Defendant's Motion to Dismiss [Docket No. 16]

The defendants have moved to dismiss the plaintiff's claims on the grounds that 1) the Court lacks personal jurisdiction over the defendants, both of whom are Florida residents and do not operate any offices or manufacture their products in Massachusetts, and 2) venue is improper in Massachusetts.[1] Alternatively, they move the Court to transfer the case to the Middle District of Florida, Orlando Division.

#### 1. Exercise of Personal Jurisdiction in Massachusetts

On a motion to dismiss for want of personal jurisdiction, the plaintiff bears of the burden of demonstrating that jurisdiction is 1) statutorily authorized and 2) consistent with the Due Process Clause of the United States Constitution. *Astro–Med, Inc. v. Nihon Kohden America, Inc.*, 591 F.3d 1, 8 (1st Cir.2009). Because the Massachusetts long-arm statute reaches to the full extent that the Constitution allows, the

Court will proceed directly to the Constitutional analysis. *See Tatro v. Manor Care, Inc.*, 416 Mass. 763, 625 N.E.2d 549, 553 (1994).

Due Process requires that the defendants have "minimum contacts" with the forum state such that the "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The First Circuit employs a tripartite analysis to determine whether specific jurisdiction is appropriate.[2] The court inquires as to: 1) whether the claims arise out of or are related to the defendants' in-state activities, 2) whether the defendants have purposefully availed themselves of the laws of the forum state and 3) whether the exercise of jurisdiction is reasonable under the circumstances. *See, e.g., Platten v. HG Bermuda Exempted, Ltd.*, 437 F.3d 118, 135 (1st Cir.2006).

##### a. Relatedness

The "relatedness" test is a "flexible, relaxed" standard that focuses on the nexus between the plaintiff's claim and the defendants' contacts with the forum state. *Astro–Med*, 591 F.3d at 9; *Ticketmaster–New York v. Alioto*, 26 F.3d 201, 206–07 (1st Cir.1994). Here, although the Bots are created in Florida, they are sold to customers in Massachusetts via the defendants' website. Those customers then use the Bots (in Massachusetts) in alleged violation of the game's Terms and Conditions which, in turn, purportedly causes harm to other, honest players. Plaintiff alleges that, as of February, 2010, Massachusetts was home to more Runescape players using the defendants' Bots than all but three other states. Therefore, notwithstanding

---

1. Given that Impulse Software is not a legal entity, personal jurisdiction is dependent on the activities of the two individual defendants.

2. Although the plaintiff does not expressly allege specific jurisdiction, general jurisdiction is unwarranted.

the fact that the Bots are manufactured in Florida, plaintiff's claims are sufficiently related to defendants' Massachusetts activities.

### b. Purposeful Availment

█ To satisfy the second requirement, the Snellman brothers' "in-state contacts must represent a purposeful availment of the privilege of conducting activities" in Massachusetts, "thereby invoking the benefits and protections" of the laws of the Commonwealth. *Astro–Med*, 591 F.3d at 10. The purposeful availment factor focuses on voluntariness and foreseeability. *Ticketmaster–New York*, 26 F.3d at 207.

In cases involving internet commerce, personal jurisdiction operates on a sliding scale whereby the likelihood that jurisdiction can be exercised is "directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Zippo Manufact. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124 (W.D.Pa.1997) (cited in *Gather, Inc. v. Gatheroo, LLC*, 443 F.Supp.2d 108, 115 (D.Mass.2006)). At one end of the spectrum are situations in which a defendant clearly does business in a foreign jurisdiction by entering into contracts with residents of that jurisdiction or by knowingly and repeatedly transmitting electronic files to those persons. At the opposite end are situations in which a defendant has simply posted information on a passive website that is accessible to users in a foreign jurisdiction. In the middle ground, there are websites in which a user can exchange information with a host user whereby:

> the exercise of jurisdiction is determined by analyzing the level of interactivity and commercial nature of the exchange of information that occurs on the website.

*Id.*

In this case, the defendants operate interactive websites that allow Massachusetts users to exchange payment information for software codes that enable the Bots to function. Although the defendants do not specifically seek out Massachusetts customers, they do not bar them or discourage them from purchasing Bots. Moreover, the defendants' websites are not "passive" in nature and Massachusetts residents use the websites to sign electronic agreements with the defendants and to purchase and use their products. Accordingly, the defendants have purposefully availed themselves of the privileges of conducting business in Massachusetts.

### c. Reasonableness

█ In evaluating reasonableness, the Court considers a series of "Gestalt factors," including 1) the defendant's burden of appearing, 2) the forum state's interest in adjudicating the dispute, 3) the plaintiff's interest in obtaining convenient and effective relief, 4) the judicial system's interest in obtaining the most effective resolution of the controversy and 5) the common interests of all sovereigns in promoting substantive social policies. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

Here, none of the Gestalt factors weighs heavily for or against the exercise of jurisdiction in Massachusetts. Although it would be less convenient for the defendants to defend the case in Massachusetts, this factor is only significant when defendants "can demonstrate some kind of special or unusual burden," which they have not shown here. *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir.1994). Second, because Massachusetts residents have been affected by the defendants' actions, Massachusetts has an interest in adjudicating the dispute, albeit not an especially compelling one given that Massachusetts laws and

policies are not implicated. The third factor is not particularly significant because the plaintiff, a U.K. company, has no real connection to Massachusetts other than the fact that many Runescape players reside here. The fourth and fifth factors are neutral because there is no evidence that the dispute would be resolved more effectively in one forum over another. Accordingly, because most of the Gestalt factors are neutral, jurisdiction in Massachusetts is reasonable.

### 2. Whether Venue is Proper in Massachusetts

■ Under 28 U.S.C. § 1391(a)(2), venue is proper in a district "in which a substantial part of the events or omissions giving rise to the claim occurred." In making that determination, the Court looks "not to a single triggering event prompting the action," but takes a "holistic view" of the "entire sequence of events underlying the claim." *Astro–Med*, 591 F.3d at 12. Venue is often appropriate in multiple districts and the Court's task is not to determine the best venue but merely a suitable one. *Id.* Here, the defendants' promotion and sale of their Bots over the internet to Massachusetts residents, as well as the contacts and contractual relationships they have established with those residents, are sufficient to give rise to venue in this jurisdiction.

### 3. Whether Transfer to Florida is Warranted

■ In the alternative, the defendants request that the Court transfer the case to the Middle District of Florida pursuant to the federal transfer statute, 28 U.S.C. § 1404(a), which states:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Under that statute, the Court must first determine whether the case "might have been brought" in the suggested transferee district and, if so, whether convenience and the interest of justice favor transfer. In making that assessment, the Court considers a number of factors, including 1) the relative convenience of the parties and witnesses, 2) the law to be applied and 3) the connection between the forum and the issues. *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir.2000). Although the decision to transfer a case under § 1404 lies solely in the discretion of the Court, there is a strong presumption in favor of the plaintiff's choice of forum and the burden of proof rests with the party seeking transfer. *Holmes Group, Inc. v. Hamilton Beach/Proctor Silex, Inc.*, 249 F.Supp.2d 12, 16 (D.Mass.2002).

Here, although the case "might have been brought" in the Middle District of Florida, none of the relevant factors weighs heavily in favor of transfer. Although it would be more convenient for the defendants to litigate the case in their home state, transferring venue to Florida would merely shift the inconvenience to the plaintiff. Moreover, it is too early to determine where the majority of the witnesses will be located and, given that most of the relevant documents are electronic, the physical location of such documents is inconsequential. Under the second and third factors, because federal law will be applied, neither state is substantially more connected to the issues and either would provide a suitable forum. Accordingly, defendants' request to transfer venue will be denied.

### B. Plaintiff's Motion for Preliminary Injunction [Docket No. 22]

#### 1. Standard of Review

To obtain preliminary injunctive relief under Fed.R.Civ.P. 65, a movant must demonstrate

(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships and (4) a fit (or lack of friction) between the injunction and the public interest. *Nieves–Marquez v. Puerto Rico,* 353 F.3d 108, 120 (1st Cir.2003) (citation omitted). Likelihood of success on the merits is the critical factor in the analysis and, accordingly, a strong likelihood of success may overcome a "somewhat less" showing of another element. *See Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir.1993) (citations omitted); *E.E.O.C. v. Astra USA, Inc.,* 94 F.3d 738 (1st Cir.1996).

■ In copyright and trademark cases, the first factor plays an even greater role because the resolution of the other three factors will depend, in large part, on whether the plaintiff is likely to succeed in establishing infringement. *Borinquen Biscuit Corp. v. M.V. Trading Corp.,* 443 F.3d 112, 115 (1st Cir.2006).

### 2. Application

### a. Likelihood of Success on the Merits

### i. Copyright Infringement

■■ Section 106 of the Copyright Act grants the owner of a copyright the exclusive right to "copy" the copyrighted work, i.e., to make a copy of the work, to prepare derivative works based on the work or to distribute copies of the work to the public. *See* 17 U.S.C. § 106(1)-(3). To prevail on a claim of copyright infringement, a party must demonstrate 1) ownership of a valid copyright and 2) copying the elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). A party may also contributorily infringe a copyright by "intentionally inducing or encouraging direct infringement of the copyright." *MGM Studios v. Grokster, Ltd.,* 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005).

Jagex alleges that it is the owner of several valid copyrights and that the Snellman brothers have directly infringed, and encouraged others to infringe, such copyrights. As explained above, the Bots sold on the defendants' websites operate by downloading a copy of the Runescape game client (the software that connects to the game's server) and then use "reflection" to examine the program code. The Bots perform automated functions by running a script (a kind of software program) which tells them to perform specific tasks. The game client used by the Bots is licensed to a user under Runescape's Terms and Conditions, which state, *inter alia,* that the licensee

> must not use software to gain an unfair advantage [by using] automation tools, macros [or] bots [and] must not use any game specific, third-party software that encourages breaking of our rules.

Jagex asseverates that by 1) selling Bots which copy the game client and subsequently violate Runescape's Terms and Conditions and 2) encouraging others to buy and use those Bots, the Snellman brothers are directly and contributorily infringing its copyrights. In support of that claim, Jagex cites two recent cases from other districts involving similar allegations of copyright infringement of on-line products and services. In the first case, *MDY Indus. LLC v. Blizzard Entertainment, Inc.,* 2008 WL 2757357, at *1–10 (D.Ariz. June 14, 2008), the court allowed summary judgment for the plaintiff, the owner of an MMOG called "World of Warcraft," on a copyright infringement claim against the creator of a bot designed to cheat the game. In *Ticketmaster LLC v. RMG Technologies, Inc.,* 507 F.Supp.2d 1096, 1104–1111 (C.D.Ca.2007), the court en-

tered a preliminary injunction in favor of a website owner on its copyright claim against the creator of automated device designed to enter and navigate the website.

Plaintiff's reliance on *MDY* and *Ticketmaster* is misplaced. In both of those cases, it was undisputed that the plaintiffs had copyrights on their websites and/or software. *See MDY,* 2008 WL 2757357, at *3; *Ticketmaster,* 507 F.Supp.2d at 1104. Here, however, the plaintiff has not alleged infringement of its game client software or website because it does not own such copyrights. The 21 copyright registrations attached to the plaintiff's complaint are all Visual Arts registrations for various two-dimensional icons that appear in the Runescape game (such as an "anvil icon," an "archery icon" and a "chisel icon"), none of which the defendants currently use in their Bots or websites.[3]

The plaintiff responds that registration of its game client software is not a prerequisite to filing suit because Runescape, which was entirely developed and initially published in the United Kingdom, is not a "United States work," as defined by the Copyright Act. *See* 17 U.S.C. § 101 (defining "United States work"); 17 U.S.C. § 411 (requiring registration or preregistration of a copyright of a United States work prior to filing suit). That argument is unavailing. Even if the absence of a registered copyright for the Runescape software and game client does not bar injunctive relief, it makes it unlikely that the plaintiff will succeed on the merits of its copyright claim.

The plaintiff maintains, in the alternative, that the defendants are still infringing its 21 Visual Arts copyrights notwithstanding the fact that they have removed all

such images from their websites. According to the plaintiff, when a player downloads the defendants' Bots and uses them in the Runescape game, which includes the 21 copyrighted images, he exceeds the terms of his limited license and thus infringes the copyrights of those images.

Plaintiff's argument is futile. Even if the plaintiff's 21 copyrighted images are included in the Runescape software, it is not at all clear that a Bot user infringes the copyrights of those images when he plays Runescape in excess of his limited license, particularly where the significance of such images within the Runescape game has not been explained. Thus, in the absence of a registered copyright on the Runescape software, the plaintiff has not demonstrated a substantial likelihood of success on the merits of its copyright claim.

### ii. Digital Millennium Copyright Act

■ The Digital Millennium Copyright Act ("DMCA"), which was enacted to "strengthen copyright protection in the digital age," prohibits persons from manufacturing or providing any technology or product that is "primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access" to a protected work. 17 U.S.C. § 1201(a)(2); *Universal City Studios v. Corley,* 273 F.3d 429, 435 (2nd Cir.2001). To establish liability under the DMCA, Jagex must demonstrate that

> (1) the defendant[s] trafficked in a technology and (2) the technology was primarily designed or produced to circumvent conditional access controls to protected works, or has limited commercially significant use other than such circumvention.

---

**3.** Apparently, plaintiff complained to the defendants about the use of such icons in the spring of 2008 and, in response, the defendants removed all such icons from their product.

*CoxCom, Inc. v. Chaffee,* 536 F.3d 101, 110 (1st Cir.2008) (internal citation omitted).

Jagex contends that the Bots, which allegedly download the Runescape game client and use a process called "reflection" to examine its internal operation, circumvent a "technological measure" put in place by Runescape to protect its copyrighted work. Because the Bots are specifically designed to facilitate cheating in the Runescape game, they have no commercially significant purpose other than to circumvent Jagex's protective measures.

Jagex's DMCA claim is untenable. First, as explained above, Jagex does not own a valid copyright for its software program or game client. Although it insists that copyright registration is not a prerequisite to filing suit, the absence of that copyright makes it difficult for plaintiff to succeed on it's the DMCA claim which is dependent on proof of a valid copyright.

Second, Jagex has not indicated a specific "technological measure" that the defendants' Bots are circumventing. A technological measure is generally a password, encryption program or other firewall device that regulates access to a protected work. *See MDY,* 2008 WL 2757357, at *11 (where game had a protection called a "warden" that scanned the user's computer for unauthorized programs and revoked access to the game upon detection of a infringing program); *Ticketmaster,* 507 F.Supp.2d at 1111–1112 (where website had a computer security program that blocked automated access to its copyrighted pages by distinguishing between human users and computer programs). In contrast, the Runescape website is generally accessible to the public and has no specific technological measure designed to block access to copyrighted works. Accordingly, Jagex is unlikely to succeed on the merits of its DMCA claim.

### iii. Trademark Infringement

To prevail on a claim of trademark infringement, Jagex must show that 1) the mark "Runescape" is a valid, legally protectable trademark, 2) Jagex owns the mark and 3) the defendants' use of similar marks is likely to cause consumer confusion as to the origin of the goods. *See Three Blind Mice Designs Co. v. Cyrk, Inc.,* 892 F.Supp. 303, 309 (D.Mass.1995).

Jagex alleges (and the defendants do not dispute) that it owns Trademark Registration No. 2,829,952 for the mark RUNESCAPE for use in entertainment services, including providing an online multi-user computer games via local networks. It further contends that the defendants, in connection with the sale and marketing of Bots, are using the Runescape mark in a way that is likely to cause consumer confusion. Specifically, the plaintiff alleges that the defendants 1) promote the Bots on websites such as "Runescape cheating asylum" (www.runescape.su), 2) use the Runescape mark throughout such websites and 3) use an email address ending in @runescape.su, causing consumers to believe they are associated with or endorsed by Jagex.

As the defendants point out, plaintiff's trademark claim is likely moot because defendants have already removed all potentially confusing references to Runescape from its websites. Subsequent to the filing of the instant lawsuit, the defendants 1) disabled the website www.runescape.su, 2) changed the name of their active website (www.rscheata.net) from "Runescape Cheating Asylum" to "RS Cheating Asylum" and 3) began censoring their customers' online discussions such that anytime a user posts the word "Runescape" in a forum, it is automatically replaced with "RS".

The plaintiff insists that the defendants' actions do not negate its trademark claim

because the abbreviation "RS," for which it owns a community trademark, is widely known to be synonymous with Runescape.[4] That argument is impotent. Even if the plaintiff has a registered community mark on the abbreviation "RS," the defendants are not obviously using the mark to cause consumer confusion. It is clear from the name of the defendants' website ("RS Cheating Asylum") that it does not promote a version of the Runescape game itself but rather a program intended to cheat that game. Thus, because it is implausible that the creator of a computer game would create a website that encourages players to cheat at it, the likelihood of consumer confusion is slim. Accordingly, the plaintiff's Lanham Act claim is unlikely to succeed.

#### iv. Computer Fraud and Abuse Act

■ Finally, plaintiff alleges that the defendants violated the Computer Fraud and Abuse Act ("CFAA") by exceeding, and causing others to exceed, authorized access to the Runescape game software. The CFAA makes it unlawful to:

> knowingly and with the intent to defraud . . . exceed [ ] authorized access [of a protected computer], and by means of such conduct further [ ] the intended fraud and obtain [ ] anything of value.

18 U.S.C. § 1030(a)(4).

Plaintiff alleges that the defendants, by offering the Bots for sale, exceed their authorized access to the Jagex server by violating the Terms and Conditions as stated on the Runescape website, specifically the prohibition on "automation tools, macros, bots, or autotypers [and] game-specific, third-party software that encourages breaking of [Runescape's] rules." The defendants respond that the Runescape server does not qualify as a "protected computer" under section 1030 because 1) the

website is available to anyone who accesses the internet and 2) players can download the game client, without ever seeing or agreeing to the Terms and Conditions.

Defendant's argument is disingenuous. Although a new player can try out Runescape without agreeing to its Terms and Conditions, such play is available only during a ten-hour trial period. After that initial period, the player exhausts all content that is available in the introductory mode and, if she wishes to continue to a higher level, she must register officially and agree to the Terms and Conditions.

Nevertheless, even if Runescape's Terms and Conditions transform its server into a "protected computer," plaintiff has not demonstrated a strong likelihood of success on the merits of its CFAA claim. Notably, plaintiff fails to explain how the defendants (as opposed to the Bots users) exceed authorized access to the Runescape server, particularly where the defendants are not alleged to have agreed to the game's Terms and Conditions.

The plaintiff's theory of contributory liability under the CFAA is also unpersuasive because the plaintiff has not cited any authority to support it. *Cf. Doe v. Dartmouth–Hitchcock Medical Center*, 2001 WL 873063, at *4–5 (D.N.H. July 19, 2001) (rejecting plaintiff's theory of vicarious liability under the CFAA and noting that the statute creates only a "limited private right of action against *the violator*") (emphasis in original). Thus, at least at this stage of the proceedings, plaintiff's allegations do not convince the Court that it is likely to succeed on its CFAA claim.

#### b. Irreparable Harm

■ Jagex contends that, in the absence of an injunction, it will suffer irreparable harm in the form of loss of goodwill,

---

4. A "community trademark" refers to a mark that is registered in the European Union.

damage to its reputation and immeasurable financial damages. Specifically, Jagex alleges that the defendants' actions have created a stigma surrounding Runescape and, as a result, members of the gaming community have chosen to play other MMOGs that are not riddled with cheaters. Jagex asserts that it has already had to invest time and resources into combating the intrusive software and resolving user complaints.

Although a showing of likelihood of success on the merits of its infringement claims presumes irreparable harm, *see I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 33 (1st Cir.1998), plaintiff has failed to make the requisite showing. Moreover, plaintiff's delay in filing suit and moving for injunctive relief undermines its claim of irreparable harm. Jagex admits that it was aware of the defendants' allegedly infringing websites as early as April, 2008, but despite that knowledge, waited two years to file its complaint and another five months to move for a preliminary injunction. *See Fritz v. Arthur D. Little, Inc.,* 944 F.Supp. 95, 99 (D.Mass.1996) ("[A]n unreasonable delay between the time when a plaintiff is first apprised of the infringing acts and the time of filing suit will rebut the presumption of irreparable harm"). Although plaintiff insists that its motion for injunctive relief was triggered by the recent launch of defendants' new website, the Court finds that that site is insufficiently different from the defendants' prior sites to excuse the delay. *See id.* at 98 ("More harm is not necessarily any more irreparable, so long as it is not qualitatively different.").

### c. Balance of the Equities

■ If a plaintiff can demonstrate a likelihood of success on the merits of its infringement claims, the balance of the equities generally tips in its favor, particularly where the only hardship the defendant will suffer is lost profits. *See Concrete Machinery Co., Inc. v. Classic Lawn Ornaments,* 843 F.2d 600, 612 (1st Cir. 1988). Here, however, Jagex has not made a strong showing of likelihood of success and, accordingly, the balance of the equities favors the defendants.

### d. Public Interest

Plaintiff has not demonstrated that the public interest will be furthered by entering an injunction. Even if the defendants' activities, which promote a culture of cheating, harm the gaming community as a whole, the plaintiff has not adequately proven that it is likely to succeed on the merits of its claims and, accordingly, injunctive relief is unwarranted.

### ORDER

In accordance with the foregoing, defendants' motion to dismiss or, in the alternative, to transfer venue (Docket No. 16) is **DENIED** and plaintiff's motion for preliminary injunction (Docket No. 22) is **DENIED.**

**So ordered.**