**ZAMORA RADIO, LLC, Plaintiff,**

v.

**LAST.FM, LTD., CBS Radio Inc., CBS Corp., Slacker, Inc., Pandora Media, Inc., Rhapsody America LLC, Realnetworks, Inc., Dkcm, Inc., Soundpedia, Inc., AOL, LLC, Accuradio, LLC, and Yahoo! Inc., Defendants.**

**Case No. 09–20940–CIV.**

United States District Court,
S.D. Florida.

Nov. 5, 2010.

Alejandro Alvarez, Phillip Edward Holden, The Alvarez Law Firm, Coral Gables, FL, John F. Ward, David M. Hill, Michael G. Gabriel, Ward & Olivo, New York, NY, Annette Cristina Escobar, Chalon Tamara Allen, Edward Maurice Mullins, Astigarraga Davis Mullins & Grossman, Miami, FL, for Plaintiff.

Andrew S. Brown, Weil Gotshal & Manges, Mark D. Baker, Tigran Vardanian, Quinn Emanuel Urquhart Oliver & Hedges, New York, NY, Annette Cristina Escobar, Edward Maurice Mullins, Chalon Tamara Allen, Astigarraga Davis Mullins & Grossman, Edward Soto, Robert S. Berezin, Weil Gotshal & Manges, Bruce Judson Berman, Carlton Fields, Samuel M.

Sheldon, McDermott Will & Emery LLP, Stanley Howard Wakshlag, Kenny Nachwalter, P.A., Paul Joseph Schwiep, Coffey Burlington, Miami, FL, Edward R. Reines, Stefani C. Smith, Weil Gotshal & Manges LLP, Redwood Shores, CA, J. Pieter Van Es, Matthew P. Becker, Richard S. Stockton, Thomas J. Lerdal, Banner & Witcoff, Chicago, IL, Charles K. Verhoeven, Jennifer A. Kash, Linda J. Brewer, Richard H. Doss, Quinn Emanuel Urquhart & Sullivan, LLP, San Francisco, CA, for Defendants.

### ORDER ON DEFENDANT PANDORA MEDIA, INC.'S MOTION FOR SUMMARY JUDGMENT OF NON–INFRINGEMENT

EDWIN G. TORRES, United States Magistrate Judge.

This matter is before the Court upon Defendant Pandora Media, Inc.'s ("Defendant" or "Pandora") Motion for Summary Judgment of Non–Infringement [184]. Previously, the Court issued the Claim Construction Order in this case on March 9, 2010 [D.E. 170]. We have reviewed the motion, the response, and the record in the case. For the following reasons, the motion is granted.

### I. BACKGROUND

This is a patent infringement action concerning a U.S. Patent No. 6,349,339 ("the '399 Patent") owned by Plaintiff Zamora Radio, LLC ("Zamora"). Issued on February 19, 2002, the '399 Patent concerns a streaming media system technology commonly referred to as "internet radio." Defendants in this case are various "internet radio" service providers who allow their customers to stream music and other web-based services to customers' personal computers, mobile phones or other compatible electronic devices. Users of Defendants' services in question do not have any ownership rights to the music or other data

that Defendants stream for playback. Thus, users cannot rewind or replay the streamed data. They can, however, pause or skip the currently played song or audio segment.

On April 10, 2009, Zamora brought this patent infringement action claiming that Defendants' products and services utilize the systems and methods disclosed and claimed in its '399 Patent. Defendants answered the Complaint and filed counterclaims for non-infringement and invalidity.

The patent-in-suit, titled "System and Method for Utilizing Data Packets" sets forth 43 claims. Generally speaking, the '399 Patent relates to a system and method for providing a predetermined group of data packets to a user who may utilize (e.g. review, listen, watch, read, etc.) such data packets with a user computing arrangement "UCA." *See* '399 Patent 1:44–55 [D.E. 1 Ex. 1]. The UCA then executes a set of instructions to utilize the data packets in the predetermined order, whereby the user is allowed to skip ahead to the next data packet in the predetermined order but is prevented from modifying that order or replaying a utilized data packet. *Id.*

One of the Defendants, Pandora Media, Inc., now moves for summary judgment that their radio internet products do not infringe any of the asserted claims of the '399 Patent. Zamora opposes Defendant's motion arguing that: 1) the motion should be denied as moot in view of Plaintiff's acknowledgment of non-infringement on certain one limitation; 2) the motion should also be denied pursuant to Fed. R.Civ.P. 56(f) because all discovery relevant to Defendants' motion was not completed by agreement of the parties; 3) existence of genuine issues of material fact preclude summary judgment of non-infringement at this stage.

## II. STANDARD OF REVIEW

### A. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden is met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Thus, the non-moving party "may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the court must not make credibility determinations or weigh conflicting evidence. *Id.* at 255, 106 S.Ct. 2505. Rather, the court must view the evidence in the light most favorable to the non-moving party, drawing all "justifiable inferences" in its favor. *Id.* (internal citation omitted); *see Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed.Cir.2008) (internal citation omitted). The Federal Circuit has held that

"summary judgment is as appropriate in patent case as in any other...." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed.Cir. 1984).

### B. Patent Infringement Analysis

A patent infringement analysis involves two steps: claim construction and then the application of the construed claim to the accused process or product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The first step, claim construction, has been held to be purely a matter of law. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc). The second step, application of the claim to the accused product, is a fact-specific inquiry. *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed.Cir.2001) (Patent infringement, "whether literal or under the doctrine of equivalents, is a question of fact."). Summary judgment, therefore, is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.2001).

### C. Burden of Proof

The patentee asserting infringement bears the burden of proof by a preponderance of the evidence. Indeed, the Federal Circuit expressly stated that the "patent owner has always borne the burden of proving infringement." *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 685 (Fed.Cir.1990). Thus, "[s]ince the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of non-infringement may meet its

initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed.Cir.2001).

"[O]n issues in which the nonmovant bears the burden of proof, in contrast to those in which the movant bears the burden, the movant need not 'produce evidence' showing the absence of a genuine issue of material fact in order to properly support its summary judgment motion." *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1307 (Fed.Cir.2006) (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). In other words, "nothing more is required than the filing of a summary judgment motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations." *Id.* at 1309. Once the movant has satisfied its initial burden, the "burden of production then shift[s] to [the non-movant] to identify genuine issue that preclude summary judgment." *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 990 (Fed.Cir.2006).

### D. Infringement

#### 1. Direct Infringement

A patentee may sue for direct infringement under 35 U.S.C. § 271(a):

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefore, infringes the patent.

■ The "making, using, or selling of a patented invention is the usual meaning of the expression 'direct infringement.' " *Joy Techs. Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed.Cir.1993).

■ Using the properly construed claims as a guide, the trier of fact must determine whether every claim limitation or its equivalent is found in the accused device or process. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995); *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 547 (Fed.Cir.1994) ("For literal infringement, each limitation of the claim must be met by the accused device exactly, any deviation from the claim precluding a finding of infringement."). Accordingly, a claim cannot be literally infringed if any claim element or limitation is missing entirely from the accused product. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1539 (Fed.Cir.1991). However, "the addition of features does not avoid infringement, if all the elements of the patent claims have been adopted. Nor is infringement avoided if a claimed feature performs not only as shown in the patent, but also performs an additional function." *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 945 (Fed.Cir.1990) (citation omitted).

■ In contrast to literal infringement, which requires that the accused device precisely embody every limitation in the claim, the "doctrine of equivalents allows the patentee to claim those insubstantial alternations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Felix v. Am. Honda Motor Co., Inc.*, 562 F.3d 1167, 1181 (Fed.Cir.2009) (internal citation omitted). An "[i]nfringement analysis under the doctrine of equivalents proceeds element-by-element; a generalized showing of equivalency be-

tween the claim as a whole and the allegedly infringing product or process is not sufficient to show infringement." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1286 (Fed.Cir.2009) (internal citation omitted). "The primary test for equivalency is the ... 'triple identity' test, whereby the patentee may show an equivalen[ce] when the accused product or process performs substantially the same function, in substantially the same way, to achieve substantially the same result, as disclosed in the claim." *Id.*

### 2. Indirect Infringement

Liability under Section 271(b) arises when a defendant "actively induces infringement of a patent." Induced infringement is found where a person actively and knowingly aids and abets another's direct infringement. *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed.Cir. 1988) ("Although section 271(b) does not use the word 'knowing,' the case law and legislative history uniformly assert such a requirement."). In order to establish a claim for induced infringement, the patentee must show that: (1) there has been direct infringement; (2) the alleged infringer knowingly induced infringement; and (3) the alleged infringer possessed specific intent to encourage another's infringement. *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed.Cir.2005). A party may be found liable for induced infringement when it sells a product and provides instructions on how to use it in an infringing manner. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1360 (Fed.Cir.2006); *see also Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005) ("[I]nstructing how to engage in an infringing use, show[s] an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law's reluctance

to find liability when a defendant merely sells a commercial product suitable for some lawful use.").

A defendant is liable for contributory infringement if it:

> offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

35 U.S.C. § 271(c). After sorting through the statutory language, Section 271(c) essentially instructs us that a party who sells a product that can be used for only one purpose must be liable for contributory infringement. *See Metro–Goldwyn–Mayer Studios*, 545 U.S. at 932, 125 S.Ct. 2764 ("[W]here an article is 'good for nothing' but infringement, there is no legitimate public interest in its unlicensed availability, and there is no injustice in presuming or imputing an intent to infringe.").

Because direct infringement is a necessary element under both Section 271(b) induced infringement and Section 271(c) contributory infringement, courts usually start the analysis by addressing that element of both claims.

### III. ANALYSIS

#### A. Defendant's Motion is not Moot

Following this Court's entry of the Claim Construction Order [D.E. 170] on March 9, 2010, Zamora filed its Motion for Entry of Consent Judgment [D.E. 175] contending that, under the adopted claim construction, Defendants' accused product do not infringe on the '399 Patent citing to

only one claim limitation.[1] Defendants, however, jointly opposed Plaintiff's motion. [D.E. 176]. They argued that, in addition to the issue on which Plaintiff consented to non-infringement, Defendants are entitled to a judgment as a matter of law of non-infringement on additional grounds. Subsequently, we denied Plaintiff's motion after concluding that "there was obviously no consent from Defendants" for the entry of Zamora's proposed judgment. [D.E. 209].

■■■■ Plaintiff now essentially renews its argument that its concession of non-infringement on one claim limitation moots out any possible remaining basis on which summary judgment may be granted in Defendants' favor. We, however, disagree.

Pursuant to 28 U.S.C. § 1295(a)(1), the Federal Circuit has appellate jurisdiction "from a final decision of a district court." "[A] decision is not final, ordinarily, unless it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Cunningham v. Hamilton Co., Ohio,* 527 U.S. 198, 204, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999). Thus, "final judgment in a patent case will usually produce a judgment of infringement or non-infringement." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,* 442 F.3d 1322, 1326 (Fed.Cir.2006).

Plaintiff is technically correct that an entry of a consent judgment of non-infringement based on only one claim limitation produces an appealable "final" order that grants the Federal Circuit appellate jurisdiction. *See, e.g., Mass. Inst. of Tech. v. Abacus Software,* 462 F.3d 1344, 1350–51 (Fed.Cir.2006) (Federal Circuit has ju-

risdiction to review parties' stipulated entry of final judgment of non-infringement). Here, however, contrary to Plaintiff's assertion, Defendant has not consented to an entry of a judgment that rests only on one claim limitation. Instead, Defendant seeks to obtain summary judgment of non-infringement on additional grounds. Absent an agreement with Pandora, Plaintiff does not get to pick and choose the grounds on which final judgment of non-infringement will rest on. Instead, we agree with Defendant that the appeal of this Court's final judgment should proceed on a fully developed record after consideration of all non-infringement grounds in a properly supported motion for summary judgment.

Furthermore, the Federal Circuit has "criticized trial courts for not providing facts in the record that would assist [appellate court's] ability to determine whether a particular claim term plays a determinative role in infringement or invalidity." *Toshiba Corp. v. Juniper Networks, Inc.,* 248 Fed.Appx. 170, 172 (Fed.Cir.2007) ("Toshiba's stipulation of noninfringement in this case provided no facts regarding how the district court's construction affects the infringement analysis"); *Mass. Inst. of Tech.,* 462 F.3d at 1350–51 (describing an appeal based on bare stipulated concession of non-infringement to be "highly undesirable").

### B. Lack of Discovery Argument has no Merit

Next, Zamora argues that Defendant's motion should be denied because *all* discovery relevant to this summary judgment motion has not yet been completed. It

---

1. In our Claim Construction Order we found that the claim term "executing a set of instructions which utilize the data packets in a predetermined order in accord with the rules" means "setting the order of data packets by the software application on the user computer, based on the rules, and then utiliz-

ing the data packets with that order." Based on this finding, Plaintiff consented that because Defendants' accused systems set the order of the data packets by a software application on the Defendants' servers, these systems do not infringe on the '399 patent.

contends that following our entry of the Claim Construction Order, the parties have stipulated to stay all further discovery in view of Plaintiff's acknowledgment that the Defendant's accused product could not infringe the '399 Patent under the current claim construction. Defendant, on the other hand, claims that there has never been any stipulation to stay discovery and that it has complied with all discovery requests served on them.

This case was filed on April 9, 2009. Pursuant to this Court's Amended Scheduling Order, the discovery deadline passed on March 26, 2010 [D.E. 169]. Considering the fact that our Claim Construction Order was issued on March 9, 2010, Zamora essentially concedes that it conducted no relevant and material discovery for the eleven-month time frame following the commencement of this action. It does not offer an explanation, however, why it did not bother to actively pursue discovery from Defendant during that time. We do not see how Zamora planned on litigating this action in the event we adopted its version of the claim construction. Naturally, instead of consenting to judgment of "non-infringement" and allegedly "staying" discovery, Zamora apparently planned to pursue all relevant discovery from multiple independent Defendants on a highly complex patent issue in roughly two weeks. We are not convinced by the logic in Plaintiff's argument regarding its lack of discovery.

 Zamora cites to Rule 56(f) in its support. The rule, however, is clearly inapplicable here. "A Rule 56(f) motion must be supported by an affidavit which sets forth with particularity the facts the moving party expects to discover and how those facts would create a genuine issue of material fact precluding summary judgment." *Harbert Int'l Inc. v. James,* 157 F.3d 1271, 1280 (11th Cir.1998). Plaintiff submitted no affidavit describing the facts

it needs or how those facts would create a genuine issue of material fact. Furthermore, Zamora failed to establish "specified reasons" why it could not present essential facts in its opposition. Fed.R.Civ.P. 56(f). Rule 56(f) requires that "[t]he moving party must also have been diligent" in seeking the discovery. *Exigent Technology, Inc. v. Atrana Solutions, Inc.,* 442 F.3d 1301, 1310 (Fed.Cir.2006) (citing *Barfield v. Brierton,* 883 F.2d 923, 931–33 & n. 11 (11th Cir.1989)). Here, Zamora has failed to demonstrate that it exercised diligence during the discovery process. For these reasons, Plaintiff's assertion that Pandora's motion should be denied pursuant to Rule 56(f) is meritless.

Instead, Defendant has proffered that it has responded to all of Plaintiff's discovery requests well before the close of discovery. It further represents that Zamora chose to forego the deposition of Pandora's infringement expert that was scheduled to occur before the close of discovery. It is clear to the Court that any "prejudice" that Plaintiff now faces at the summary judgment stage due to the insufficient amount of necessary discovery can only be attributed to Zamora's own doing.

### C. Non–Infringement

#### 1. Asserted Claims and Claim Construction

Before addressing the merits of Defendant's Motion for Summary Judgment, the Court reviews the claims and the Court's construction. As previously noted, the patent-in-suit, titled "System and Method for Utilizing Data Packets," sets forth 43 claims. The '399 Patent relates to a system and method for providing a predetermined group of data packets to a user who may utilize (e.g.review, listen, watch, read, etc.) such data packets with a user computing arrangement "UCA." *See* '399 Patent 1:44–55. The UCA then executes a set of

instructions to utilize the data packets in the predetermined order, whereby the user is allowed to skip ahead to the next data packet in the predetermined order but is prevented from modifying that order or replaying a utilized data packet. *Id.*

Of the 43 claims, Claims 1, 21, 26–27, 29–35, 39–40, and 43 are independent claims. Zamora asserted infringement by Pandora of independent Claims 1, 21, 26, and 30–33. *See* Def.'s Statement of Facts ¶ 55 [D.E. 187]. The parties disputed the meaning of ten terms. Nine of the terms, emphasized below, are found in representative Claim 1 which identifies all the limitations that are at issue in Defendant's motion. The term "limited access" is found in Claim 7:

> 1. A method, comprising the steps of: providing *"data packets"* from a server arrangement to a user computing arrangement; determining, using at least one of the server and the user computing arrangement, *"rules"* governing *"utilization"* of the data packets by the user computing arrangement and *"preventing"* a user from altering the rules; *"storing"* the data packets on a storage device of the user computing arrangement; and with the user computing arrangement, *"executing a set of instructions"* which utilize the data packets in a *"predetermined order"* *"in accord with the rules,"* wherein the user of the user computing arrangement is prevented from *"modifying"* the predetermined order.
>
> . . .
>
> 7. The method according to claim 6, further comprising the steps of: providing a *"limited access"* to the utilized data packets; and enabling the user to

purchase at least one packet of the utilized data packets.

*See* '399 Patent 7:34–48, 8:16–20.

In our March 9, 2010 Claim Construction Order, we construed the disputed terms in the following manner: The term "data packets" was construed to mean "a group of at least two complete content items (e.g., audio, video, advertisements, or the like)." *See* Claim Construction Order at 8 [D.E. 170]. The term "rules governing utilization" was construed to mean "criteria that define the selecting, grouping, and using." *Id.* at 12. "Storing" was construed to mean "retaining for instantaneous or later use." *Id.* at 13. The term phrase "executing a set of instructions which utilize the data packets in a predetermined order in accord with the rules" was construed as "setting the order of the data packets by the software application on the user computer, based on the rules, and then utilizing the data packets with that order." *Id.* at 17. Finally, the parties have stipulated to the meaning of terms "preventing," "modifying," and "limited access." *Id.* at 12, 18.

### 2. Accused Products and Services

The following facts about Defendant's products and services are undisputed.[2] Pandora is the creator and operator of "Pandora Radio." *See* Def.'s Statement of Facts ¶ 23 [D.E. 187]. "Pandora Radio" may be accessed by personal computers, mobile devices such as cellular phones, and in-home devices like Blue–Ray players, Table–Top Radios, Digital Media Players, and Home Theater Systems. *Id.* Zamora has only provided an infringement opinion with respect to Pandora's web-browser-based implementation used to access "Pan-

---

**2.** Although we cite to Defendant's Statement of Facts hereafter, which are largely uncontested by Plaintiff, Defendant presents its noninfringement case through: 1) affidavit and a report of Bruce M. Maggs, Ph.D, Pandora's expert witness; 2) affidavit of Thomas Conrad, Chief Technical Officer of Pandora Media, Inc.; and 3) Thomas J. Lerdal, counsel for Defendant.

dora Radio." *Id.* ¶ 56. Therefore, the following explanation relates to Pandora's Web Radio.

A user may access Pandora's Web Radio via a personal computer by opening a web browser and directing it to http://www.pandora.com. *Id.* ¶ 24. Doing so will load a Tuner application (an "Adobe" "Flash" multimedia program) on the user's personal computer and display it in a web browser. *Id.* ¶ 25. Among other things, the Tuner coordinates music playback and sends user actions to the "back end" of Pandora's Web Radio which comprises a complicated web of servers that stream music content to numerous users. *Id.* ¶ 26.

If it is the user's first time accessing Pandora's Web Radio, the user will be prompted to create a radio station by initially inputting one favorite song, artist, or composer. *Id.* ¶ 27. Songs, artists, and composers entered by a listener are called "seeds." *Id.* Pandora's Web Radio uses seeds to generate sets of musically similar songs that are streamed to the user for immediate playback. *Id.* ¶ 28.

A simplified view of how Pandora selects songs to play is as follows. Songs are selected in "fragments" or "sets" to be played, each consisting of four songs. *Id.* ¶ 29. To create a fragment, a program running on a Pandora application server first randomly selects one of the station's seeds to be the "userSeed" for the fragment. From the "userSeed," Pandora's application server selects songs potentially suitable for the fragment using a complex algorithm based in part on musicological similarity. *Id.* ¶ 30. The potential songs are further filtered by the server to compute a fragment or set of four songs and the server returns Music Metadata and Media Access URLs to the Tuner for the four songs. *Id.* ¶ 31.

After the four song set is created, the Tuner may begin to play the first song in the set. *Id.* ¶ 36. Using the first Media Access URL, the Tuner makes a request to the media servers to begin streaming the first song in the list of four. *Id.* ¶ 37. As the music file is delivered to the Tuner, the user's computer decodes and begins to play back the audio. *Id.* ¶ 38. Later, the Tuner requests the second music file, and the second file is streamed to the Tuner and begins playing once the first song is finished. *Id.* ¶ 39. This patter may continue until all four songs have been played, or until a user selects a "Thumbs Down" button. *Id.* ¶ 40. Once the Tuner exhausts all four songs, it sends a request to the application server for four more songs to play. *Id.* ¶ 41.

The Pandora user interface provides two "Thumbs" buttons. *Id.* ¶ 42. In Pandora's Web Radio, for example, two "Thumbs," one pointing up, and one pointing down, appear beneath the image representing the current song. *Id.* ¶ 43. Selecting the "Thumbs Down" button has several effects: 1) the song will stop playing; 2) the song will be deleted permanently from that particular station's—and only that station's—playlist; 3) if this is the second "Thumbs Down" given to the specific artist on that particular station, the artist will be banned from playing on that station—and only that station—in the future; and 4) a new set of songs with a different musical emphasis will begin to play. *Id.* ¶ 44.

"Thumbs Down" modifies the rules governing song selection in at least two ways. First, as discussed above, any song given a "Thumbs Down" is permanently deleted from the station playlist. *Id.* ¶ 47. Because this functionality alters the universe of songs available on a particular station, this functionality alone allows a Pandora user to alter which songs are selected and played on a particular station. Second, Pandora allows the user to ban artists

from a particular station using "Thumbs Down." In particular, if the user "Thumbs Downs" a particular artist twice, with a few exceptions, that artist will be banned from playing on that particular station. *Id.* ¶ 48.

Every time a fragment is generated, the application server program checks the playlist for banned songs and for artists that have received multiple "Thumbs Down." *Id.* ¶¶ 49–50. Thus, Pandora, through the "Thumbs Down" functionality, allows the user to ban particular songs and artists from station playlists which in turn alters the song selection criteria.

### 3. The Accused Products and Services do not Literally Infringe the Asserted Claims of the '339 Patent

#### a. A Server Software Application Sets the Order of Songs for Playback (All Claims)

██ Zamora consented that there is no infringement because the limitation "executing a set of instructions which utilize the data packets in the predetermined order in accord with the rules" is absent in Pandora's products. Instead, the accused systems set the order of the data packets by a software application on the Defendant's servers. *Id.* ¶ 75. Accordingly, because Pandora's Web Radio does not "set the order of the data packets by the software application on the user computer, based on the rule, and then utilize the data packets in that order," Pandora is entitled to summary judgment that it does not literally infringe any of the asserted claims of the '339 patent.

#### b. Pandora Permits a User to Alter the Rules that Govern What Songs May be Selected and Played (All Claims)

██ All of the asserted independent claims contain a limitation similar to: "determining, using at least one of the server and the user computing arrangement, rules governing utilization of the data packets by the user computing arrangement and preventing a user from altering the rules." *Id.* ¶ 67. Defendant contends that it is entitled to a summary judgment of non-infringement because these limitations are not met by Pandora's Web Radio under our claim construction.

We previously construed "rules governing utilization" to mean "criteria that define the selecting, grouping, and using." Claim Construction Order at 12. The evidence proffered by Defendant shows that Pandora expressly allows users to change criteria defining song selection in at least two ways using the "Thumbs Down" button. First, any song given a "Thumbs Down" is permanently deleted from the station playlist. *See* Def.'s Statement of Facts ¶ 47. Second, if the same artist on a station is given two "Thumbs Down," with few exceptions, the artist will be banned from the station. *Id.* ¶ 48. Every time a song fragment is generated, Pandora's application server program checks the playlist for banned songs and banned artists. *Id.* ¶ 49–50. Thus, under our construction of the phrase "rules governing utilization," Pandora allows users to alter the "criteria that define the selecting, grouping, and using" of songs. Because it allows users to alter the "criteria that define the selecting, grouping, and using" of songs, Pandora is entitled to summary judgment that it does not literally infringe any of the asserted claims of the '399 patent.

#### c. Pandora Permits a User to Modify the Predetermined Order Set by Pandora's Servers (All Claims)

██ The limitation that reads: "wherein the user of the user computing arrangement is prevented from modifying the predetermined order" in which data packets are utilized is present in every independent claim. Parties agree that "prevent-

ing" should be given its plain and ordinary meaning and "modifying" means "changing." *Id.* ¶ 14. In addition, as previously noted, the phrase "executing a set of instructions which utilize the data packets in a predetermined order in accord with the rules" was construed to mean "setting the order of the data packets by the software application on the user computer, based on the rules, and then utilizing the data packets in that order." Defendant contends that under our claim construction and ordinary meaning of "preventing," this limitation is not met by Pandora's Web Radio.

Pandora proffered evidence that its Web Radio expressly allows users to modify the predetermined order using the "Thumbs Down" button. Pandora's application servers select songs starting with a station "seed" and run a complex algorithm that results in a four song set or fragment. *Id.* ¶ 27–30. The application servers send the Music Metadata and Media Access URLs to the Tuner for four songs in the order in which the songs are to play. *Id.* ¶ 31. The songs play in order, except when a user selects a "Thumbs Down." When a user clicks on "Thumbs Down," the song currently being played stops, any remaining songs in the sequence are not played, and a new sequence of songs is generated for playback. Therefore, under our claim construction, Pandora allows users to change the predetermined order in which songs are to be played. As a result, because Pandora allows users to change the predetermined order in which songs are to be played, it is entitled to summary judgment of non-infringement on this ground as well.

### d. *Pandora does not Provide Limited Access to Utilized Data Packets or Enable Users to Purchase Data Packets (Claim 7)*

 Defendant argues that it is also entitled to summary judgment of no infringement with respect to Claim 7 be-

cause Pandora does not "provide limited access to utilized data packets" or enable a "user to purchase at least one packet of the utilized data packets" as required by Claim 7.

Dependent Claim 7 is a method according to independent Claim 1 and dependent Claim 6 and is further comprising the steps of "providing a limited access to the utilized data packets; and enabling the user to purchase at least one packet of the utilized data packets." *See* '399 Patent 8:16–20.

First, Pandora has proffered uncontested evidence that it does not provide "a limited access to the utilized data packets." The ordinary meaning of this limitation requires some functionality that permits a user to revisit a "data packet" that was previously "utilized." There is only one description of limited access in the '399 patent specification. It states: "The user may access these reviewed data packets and review only a short portion of the reviewed data packet … This limited review feature allows the user to revisit the content of the reviewed data packet (e.g. to verify the data packet before purchasing)." *Id.* 5:2–7. Zamora's expert, Ivan Zatkovich, admits that Pandora does not allow "limited access to the utilized data packets:"

Q: And which data packet that has already been utilized does Pandora permit access to?

A: I'm not aware that they provide access to any packet once it's been utilized.

Q: In fact, in your report you identify-state that a user only has access to the currently utilized data packet. Correct?

A: That's Correct.

*See* Def.'s Statement of Facts ¶ 76. Therefore, Pandora does not provide "a limited access to the utilized data packets."

Pandora also does not enable users to purchase utilized data packets as required by Claim 7. Zamora has identified two supposed purchase options from Pandora's web browser implementation that satisfy Claim 7: 1) an "upgrade" hyperlink and 2) a "buy" tab. *Id.* ¶ 71. Neither option, however, permits a user to purchase a data packet that was previously sent from Pandora server to the end user. First, the "upgrade" hyperlink does not result in the purchase of "data packets." *Id.* ¶ 51. Rather, selecting the "upgrade" hyperlink allows a user to buy additional features such as unlimited monthly listening, no advertising, higher audio quality audio streams, more skips, or a Pandora One desktop application. *Id.* Thus, selecting "upgrade" does not permit a user to purchase anything that could be called a "data packet." Furthermore, Zamora's own expert also testified that he does not know whether upgrading results in purchasing a data packet. *Id.* ¶ 77.

Second, Pandora has also proffered uncontested evidence that selecting the "buy" tab does not permit a user to purchase any data packet provided by a Pandora server. Selecting the "buy" tab results in the display of links for "iTunes," "Amazon MP3" and "Amazon CD." *Id.* ¶ 52. All three options direct a user to a third party website to buy different "data packets." *Id.* While a user may purchase—from a third party—the song that they heard on Pandora, the song purchased is not the identical "data packet" that was provided from Pandora's servers and "utilized" by the user's computer arrangement. In other words, Pandora merely provides links for the convenience of the user to third party websites that sell digital music.

Because Pandora does not provide "a limited access to the utilized data packets" or enable users to purchase utilized data packets, it is entitled to summary judgment of no literal infringement with respect to Claim 7.

### e. Pandora Permits a User to Skip From a First Song to a New Song Outside of the Predetermined Order (Claim 21)

 Defendant also contends that summary judgment of no infringement should also be granted with respect to independent Claim 21 and dependent Claims 22–25 because Pandora permits a user to skip from a first song to a song other than the second song in violation of independent Claim 21. Claim 21, and Claims 22–25 that depend from it, contain the limitation: "allowing the user of the user computing arrangement to skip from a first one of the data packets only to a second one of the data packets which immediately follows the first data packet in the predetermined order." *See* '399 Patent 9:23–26.

Defendant argues that the "Thumbs Down" functionality in Pandora, as previously described, avoids satisfaction of this limitation. We agree. Defendant has submitted uncontested evidence that when a user selects a "Thumbs Down," the user computer arrangement skips the remainder of the song, dumps out any remaining songs from the four song set, and generates a new set of four songs. *See* Def.'s Statement of Facts ¶ 44. This allows the user to skip from the first song to a new song that is outside of the predetermined order. In other words, the user skips to a song that is not what would have been the second song in the predetermined order. Thus, because the claim language in Claim 21 requires "only" skipping from a first song to a second song in the predetermined order, it is not satisfied by Pandora. Therefore, summary judgment of no literal

infringement is appropriate with respect to Claims 21–26.

### f. Pandora does not Satisfy the Limitation "Rules Permit the User to Access Only Selected Ones of the Data Packets on Demand" (Claim 24)

Dependent Claim 24 requires that ability to access some "selected ones of the data packets on demand" and prevent the user from accessing other data packets. *See* '399 Patent 9:32–36. Plaintiff concedes in its response that Pandora does not offer users the ability to play data packets "on demand" and that its products do not infringe Claim 24 of '399 Patent. Accordingly, Pandora is entitled to summary judgment of no literal infringement with respect to Claim 24 on this basis.

### g. No Indirect Infringement (All Claims)

■ For similar reasons, summary judgment of no indirect infringement is also warranted. First, liability under 35 U.S.C. §§ 271(b) and (c) requires the existence of a direct infringement. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed.Cir.2004). Thus, because Pandora does not directly infringe on the '399 Patent, it cannot be liable for inducing or contributing to infringement.

Furthermore, as shown below, there is no evidence that Defendant had the requisite intent required for a finding of indirect infringement, especially where it had no pre-suit knowledge of the '339 Patent.

To establish induced infringement under 35 U.S.C. § 271(b), Zamora must put forth evidence that Defendant knew of the '339 Patent. *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1304 (Fed.Cir.2006) ("The requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent") (citation omitted). Moreover, Zamora must also show "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* at 1306. Here, Zamora has offered no evidence that Defendant had any pre-suit knowledge of the '339 Patent. *See* Defs.' Statement of Facts 64. Similarly, Zamora has proffered no evidence that Pandora intended to encourage infringement by Defendant's customers or anyone else. *See id.* 84. Accordingly, summary judgment of no induced infringement is warranted.

For similar reasons, Defendant is entitled to summary judgment of no contributory infringement under 35 U.S.C. § 271(c). "Contributory infringement liability arises when one 'sells within the United States … a component of a patented machine … knowing the same to be especially made or especially adopted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.'" *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed.Cir. 2004). Here, Plaintiff proffered no evidence that Pandora knew about the '339 Patent before this case was filed, or intended to contribute to the infringement of the '339 Patent. Thus, Defendant is also entitled to summary judgment of no contributory infringement.

### h. The Accused Products and Services do no Infringe Under the Doctrine of Equivalents

■ The doctrine of equivalents protects a patent owner against an accused infringer who appropriates the invention, but makes insubstantial changes to avoid literal infringement. As noted by the Supreme Court, the doctrine "has taken on a life of its own, unbounded by the patent

claims." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 28, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). When applied too broadly, the doctrine interferes with the patent's public notice function by preventing competitors from determining what particular claims cover. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 732–34, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). Due to these concerns, several principles limit the scope of equivalents to which a patent claim is entitled. The doctrine cannot be applied so broadly that it would: 1) capture subject matter surrendered during prosecution; 2) encompass prior art; or 3) vitiate a claim limitation. *K–2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1366–68 (Fed.Cir.1999). Here, Defendant is entitled to summary judgment of no infringement under the doctrine of equivalents for two reasons.

First, Zamora has put forth no evidence regarding infringement under the doctrine of equivalents.

Second, the prosecution history precludes a finding of infringement under the doctrine of equivalents. During prosecution, the inventor amended the claims by replacing language that permitted either the server or UCA to order the songs with language that allowed only the UCA to generate the "predetermined order." *See* Claim Construction Order at 15–16. Because the applicant narrowed the claims to gain allowance, Zamora may not now assert that the '399 Patent covers the Pandora system where the server selects songs. *See, e.g., Festo Corp.*, 535 U.S. at 740, 122 S.Ct. 1831 ("[a] patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim"). Any holding to the contrary would permit Zamora to do exactly what the Patent and Trademark Office

forbade-claim portions of the invention disclosed in the prior art.

For all of the above reasons, the Court grants Defendant's motion summary judgment of no infringement under the doctrine of equivalents.

## IV. CONCLUSION

Based upon a thorough review of the record as a whole and the arguments presented by the parties in their motions and at the hearing, it is hereby **ORDERED** that Defendant Pandora Media, Inc.'s Motion for Summary Judgment of Non–Infringement [184] is **GRANTED** and a summary judgment is entered in favor of Defendant and against Plaintiff Zamora Radio LLC on Count I of the Complaint and Count I of Defendants' Counterclaim.